UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TYRONE CAUSEY                                          CIVIL ACTION

VERSUS                                                NO. 16-9660

STATE FARM MUTUAL                                     SECTION "I" (2)
AUTOMOBILE INSURANCE COMPANY

### FINDINGS AND RECOMMENDATION

Plaintiff, Tyrone Causey, sued State Farm Mutual Automobile Insurance Company ("State Farm"), his uninsured motorist and medical payments coverage carrier, for damages allegedly suffered in an automobile accident, statutory penalties for alleged bad faith adjusting of plaintiff's claim, and attorney's fees. Record Doc. No. 1, Notice of Removal and attached state court petition; Record Doc. No. 42, Amended Complaint. State Farm counterclaimed for a declaratory judgment that Causey is not entitled to any additional payments under the policy. Record Doc. No. 7.

On July 6, 2017, counsel for both sides and plaintiff himself appeared before me for a court-conducted settlement conference. No settlement was reached at that time, but settlement discussions were continuing. Record Doc. No. 63. On the following day, July 7, 2017, counsel for State Farm notified the presiding district judge that the parties had reached a settlement, and the court dismissed the case. Record Doc. Nos. 64, 65. Defendant subsequently filed a Motion to Enforce Settlement Agreement, Record Doc. No. 69, which was referred to me for findings and recommendation pursuant to 28 U.S.C. 636(b)(1)(B). Record Doc. No. 76. An evidentiary hearing was held concerning the

motion on October 26, 2017.  The court received several documentary and audio exhibits and heard testimony from plaintiff, his witnesses Fredrick Miller and Amanda McIntyre, and his former attorneys Jeffrey P. Green and John Michael Daly, Jr.  Both parties filed timely post-hearing memoranda.  Record Doc. Nos. 92, 93.

It is undisputed that Jeffrey Green, plaintiff's attorney at the time, emailed State Farm's lawyer on July 7, 2017, advising that Causey had authorized Green to accept defendant's settlement offer, which had been made during a settlement conference before the undersigned magistrate judge the previous day.  State Farm's counsel advised the court that a settlement had been reached and drafted settlement documents.  Plaintiff refused to sign the settlement agreement, contending that he had <u>not</u> authorized Green to accept defendant's offer.  The evidence admitted at the hearing and the parties' post-hearing memoranda present three issues:  (1)  Whether Louisiana law requires Causey to authorize his attorney in writing to settle his lawsuit; (2) if written authorization is not required, whether plaintiff authorized Green to accept defendant's settlement offer during a telephone conversation with Green on July 7, 2017; and (3) if so, whether Causey's consent to the settlement was vitiated by duress.

Having considered the record, the evidence and the submissions of the parties, and for the following reasons, IT IS RECOMMENDED that defendant's Motion to Enforce Settlement Agreement, Record Doc. No. 63, be DENIED and that this matter be re-opened.

2

I.    <u>THE APPLICABLE LAW</u>

"Louisiana law governs the construction and validity of the [alleged] settlement agreement in this case" brought under the court's diversity jurisdiction.  <u>Yaukey v. Teachers Ins. Co.</u>, No. 07-291, 2009 WL 1211033, at *3 (E.D. La. May 4, 2009) (citing <u>Lockette v. Greyhound Lines, Inc.</u>, 817 F.2d 1182, 1185 (5th Cir. 1987)); <u>accord</u> <u>Del Bosque v. AT & T Advert., L.P.</u>, 441 F. App'x 258, 261 n.4 (5th Cir. 2011); <u>Mid-Continent Cas. Co. v. Chevron Pipe Line Co.</u>, 205 F.3d 222, 230 (5th Cir. 2000).

A.    <u>Written Authority to Compromise</u>

Under Louisiana law, settlement agreements are also known as "compromises." Louisiana Civil Code article 3071 provides that "[a] compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ. Code art. 3071. "A compromise <u>shall</u> be made <u>in writing or recited in open court</u> . . . ." <u>Id.</u> art. 3072 (emphasis added).[1]  "According to the cited civil code articles and jurisprudence, for a settlement agreement to be valid and enforceable, it must either be recited in open court and capable of being transcribed from the record of the proceeding or be in writing and signed by the parties or their agents." <u>City of Baton Rouge v. Douglas</u>, 984 So. 2d 746, 748 (La. App. 1st Cir. 2008) (citing <u>Sullivan v. Sullivan</u>, 671 So. 2d 315, 317-18 (La. 1996); <u>Trask</u>

---

[1]Although articles 3071 and 3072 were added to the Civil Code in 2007, each article was "not intended to change the law" and each "preserves the requirement of Article 3071 of the Louisiana Civil Code of 1870 that a compromise must be reduced to writing." <u>Id.</u> art. 3071 comments (a), (c); art. 3072 comment (a).

v. Lewis, 258 So. 2d 603, 605 (La. App. 1st Cir. 1972)) (emphasis deleted); accord Trahan

v. Coca Cola Bottling Co., 894 So. 2d 1096, 1104 (La. 2005).

"In the absence of a valid acceptance no compromise agreement exists."  McRae v.

Ellis, 632 So. 2d 841, 844 (La. App. 4th Cir. 1994) (emphasis in original).

> A compromise agreement, like other contracts, is the law between the parties,
> and must be interpreted according to the parties' true intent.  The party who
> attempts to rely on the existence of a compromise agreement bears the
> burden of proof to show that the requirements for a valid compromise are
> present, including that the parties intended to settle.

Suire v. Lafayette City-Par. Consol. Gov't, 907 So. 2d 37, 55 (La. 2005) (citation omitted)

(emphasis added); accord Yaukey, 2009 WL 1211033, at *4; 800 Iberville St. Ltd. P'ship

v. V Rest. Grp., L.L.C., 221 So. 3d 205, 211 (La. App. 4th Cir.), writ denied, No. 2017-

1118, 2017 WL 4876730 (La. Oct. 16, 2017); Roberts v. Jonesboro, 122 So. 3d 1045, 1049

(La. App. 2d Cir. 2013).

In the instant case, no settlement agreement was recited in open court and Causey

refused to sign the draft written agreement.  Article 2997(5) of the Louisiana Civil Code,

in the chapter regarding "Mandate," requires that authority "must be given expressly to:

. . . [e]nter into a compromise."  La. Civ. Code art. 2997(5) (emphasis added).

> The law is quite clear in our jurisprudence that a party's counsel of record
> does not have authority to settle a client's claim without his client's clear and
> express consent.  The general authority granted to an attorney in an
> attorney/client contract of employment to settle the client's case constitutes
> only authority to negotiate a settlement.

Marietta Tr. v. J.R. Logging Inc., 225 So. 3d 1144, 1148 (La. App. 1st Cir. 2017) (citing

Lemoine v. Thornton, 161 So. 3d 666, 671 (La. App. 3d Cir. 2014); Sims v. USAgencies

Cas. Ins. Co., 68 So. 3d 570, 575 (La. App. 1st Cir. 2010); Bennett v. Great Atl. & Pac. Tea

Co., 665 So. 2d 84, 86 (La. App. 1st Cir. 1995)) (emphasis added).  "[T]he decision to

accept a settlement belongs to the client alone."  Culpepper & Carroll, PLLC v. Cole, 929

So. 2d 1224, 1227 (La. 2006) (citing La. R. of Prof. Conduct 1.2(a)).

Causey argues that no compromise was reached because he never gave his attorneys

written authority to settle, which he asserts is required by Louisiana Civil Code articles

3071 (quoted in its entirety above) and 2993.  Article 2993 provides that "[t]he contract of

mandate is not required to be in any particular form.  Nevertheless, when the law prescribes

a certain form for an act, a mandate authorizing the act must be in that form."  La. Civ.

Code art. 2993.[2] Causey relies on official comment (c) to article 2993, which states that,

because article 3071 "requires a written act for a compromise . . . , a mandate authorizing

the mandatary to enter into a compromise agreement must be in writing."  Id. art. 2993

comment (c).

Some decisions interpreting Louisiana law have held that a client's settlement

authorization to his attorney must be in writing.

> If not recited in open court, a compromise agreement must be
> "reduced to writing and signed by the parties or their agents."  Although the

_____

[2]Although the mandate articles were revised in 1997, article 2993 "reproduces the substance
of Article 2992 of the Louisiana Civil Code of 1870." La. Civ. Code art. 2993 comment (a). Except
for paragraph re-numbering, article 2997(5) was unchanged by the revision.

"or their agents" language does not always [appear] explicitly in the relevant jurisprudence, "it is there by implication . . . because generally the attorneys rather than the parties negotiate and contract settlement agreements." In order for an attorney to bind his or [her] client to a settlement agreement, the attorney must have the client's <u>written</u> "clear and express consent."

<u>Admin'rs of Tulane Educ. Fund v. Biomeasure, Inc.</u>, No. 08-5096, 2011 WL 4352299, at *4 (E.D. La. Sept. 16, 2011) (quoting <u>Dozier v. Rhodus</u>, 17 So. 3d 402, 408 (La. App. 1st Cir. 2009); <u>Sullivan</u>, 671 So. 2d at 317-18) (citing <u>Singleton v. Bunge Corp.</u>, 364 So. 2d 1321, 1325 (La. App. 4th Cir. 1978)) (emphasis added); <u>see also</u> <u>Gen. Elec. Credit Corp. v. Coleman</u>, 408 So. 2d 376, 377 (La. App. 1st Cir. 1981) (citing <u>Singleton</u>, 364 So. 2d at 1325) ("The general rule in Louisiana is that an attorney cannot sign a binding settlement agreement for and on behalf of his client without <u>written</u> authorization.") (emphasis added); <u>Singleton</u>, 364 So. 2d at 1325 (citing <u>Van Vleet Mansfield Drug Co. v. Anders</u>, 157 So. 166, 167 (La. App. 2d Cir. 1934); <u>Phillips-Jones Corp. v. Caskey</u>, 127 So. 46, 47 (La. App. 2d Cir. 1930)) (attorney "generally" may not sign settlement agreement "without a written authorization from the client")). However, the issue in <u>Tulane Educational Fund</u> was whether plaintiffs' complaint alleging breach of a settlement agreement should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to allege specifically that defendants had authorized their attorneys in writing to execute the "Term Sheet" that plaintiffs sought to enforce as a settlement agreement. The court found that such specific pleading was unnecessary because the complaint permitted a plausible inference that defendants' attorneys had proper authority to execute the document when they signed it. <u>Id.</u> The court

made no finding whether Louisiana law required the attorneys to have defendants' authority in writing.

My review of the case law indicates that Louisiana law is <u>not</u> clear that an attorney must receive <u>written</u> authority from his or her client to settle a lawsuit. In <u>Dozier</u>, one of two cases cited by the court in <u>Tulane Educational Fund</u> for the proposition that a client's authorization to settle must be in writing, the First Circuit actually held to the contrary: "There is <u>no requirement</u> in the law or jurisprudence that the express consent necessary to authorize an attorney to enter into a compromise be written." <u>Dozier</u>, 17 So. 3d at 408 (emphasis added). Based on the testimony of the party who refused to sign the settlement agreement, the testimony of his attorney and written correspondence from that attorney stating that his client had authorized him to accept the terms, the <u>Dozier</u> court held that the refusing party "had authorized the agreement . . . because as a matter of law, the necessary authority <u>must only be express, not written</u>." <u>Id.</u> at 409 (emphasis added); <u>see also</u> <u>Villanueva v. CNA Ins. Cos.</u>, 868 F.2d 684, 686 (5th Cir. 1989), <u>abrogated in part on other grounds by</u> <u>Salve Regina Coll. v. Russell,</u> 499 U.S. 225, 234 (1991), <u>as recognized in</u> <u>Cambridge Integrated Servs. Grp., Inc. v. Concentra Integrated Servs., Inc.</u>, 697 F.3d 248, 254-55 (5th Cir. 2012) (citing <u>F & S Equip. Co. v. Int'l Matex Tank Terminals</u>, 469 So. 2d 256, 257 (La. App. 4th Cir. 1985)) ("In Louisiana, attorneys are presumed to have authority to negotiate settlement agreements for their clients. Absent evidence that the client's consent was not clear and express, the agreement is binding. No such evidence is present

here." The court did not state that authorization must be written.); Lockette, 817 F.2d at 1183, 1185 (assuming without deciding that the testimony of plaintiff's attorney that plaintiff "had given him general authority to settle her case" and orally told him "that he was authorized to use his best judgment in settling her case were sufficient under Louisiana law to constitute a grant of settlement authority;" holding that plaintiff revoked the oral authority after her attorney agreed to a settlement without having advised her of the offer); Marietta Tr., 225 So. 3d at 1149 (despite attorney's email to plaintiffs' counsel stating that his clients agreed to settlement terms, record contained no evidence of any sort that defendants authorized their attorney to accept settlement; no mention of any need for written authority); Gerhold v. Giles, 83 So. 3d 1170, 1174, 1176 (La. App. 4th Cir. 2012) (plaintiffs' attorney "had the authority and consent of his clients to enter into the settlement agreement" when he testified that he met with plaintiffs and they orally consented to the settlement); Polk v. Polk, 735 So. 2d 737, 739 (La. App. 3d Cir. 1999) (citing La. Civ. Code art. 2997(5); Succ'n of Quartararo, 127 So. 2d 764 (La. App. 4th Cir. 1961)) ("Pursuant to the law of representation and mandate, an attorney does not have the authority to enter into a consent judgment, absent express authorization from the client," without any mention that authority must be written.); Frederic Hayes, Inc. v. Rollins, 435 So. 2d 1151, 1152 (La. App. 3d Cir. 1983) (Although the law requires the client's clear and express consent, "[t]he record in this case is totally devoid of any evidence demonstrating that the [client] ever consented in any manner whatsoever to the settlement confected by

[his attorney].") (emphasis added); <u>Van Vleet Mansfield Drug Co.</u>, 157 So. at 167 ("The authority of the agent to compromise for his principal <u>should be in writing, though this is not indispensable</u>, save when title to real estate is involved.") (emphasis added); <u>Phillips-Jones Corp.</u>, 127 So. at 47 ("[P]laintiff did not authorize its attorney, either <u>in writing or otherwise</u>, to make the settlement. . . .  Even if . . . plaintiff's attorneys did agree to the settlement, the fact remains that they had no authority from their client to make such settlement.") (emphasis added).

Causey cites <u>Bennett</u>, 665 So. 2d at 86, to support his argument that his grant of authority to Green (if any) to accept State Farm's offer was invalid because it was not in writing.  In that case, after plaintiff Bennett's attorney advised defendant's counsel that plaintiff had agreed to a settlement, Bennett refused to sign the settlement documents. Plaintiff's own attorneys filed a motion to enforce the settlement and recover their fees. Bennett's lawyer testified that plaintiff had orally agreed to the settlement, then changed her mind and fired her attorneys, while Bennett testified that "no settlement agreement [was] made" and that her attorneys "accepted that without [her] knowledge."  <u>Id.</u> at 85-86. The Louisiana First Circuit <u>reversed</u> the trial court's enforcement of the settlement.  The appeal court held that "the requirement of a writing to effect a compromise [is not] satisfied by the signature of a party's attorney alone (<u>unless such authorization is express</u> under La. C.C. art. 2997)," and that the trial court's "factual finding . . . that Mrs. Bennett verbally agreed to the settlement amount . . . is <u>immaterial</u>" because the parties never reduced their

settlement to writing.  Id. at 86 (emphasis added).  The court did not hold that Bennett's oral settlement authorization to her attorney was invalid because it was not in writing.  If the court intended to equate "express" authorization with "written" or "immaterial" with "invalid because unwritten," it did not say so.

Similarly, in Lytle v. Commercial Insurance Co., 285 So. 2d 289 (La. App. 3d Cir. 1973), upon which the Bennett court relied, a settlement agreement was reached "[a]fter discussion and negotiation between the attorneys and their clients," during which plaintiff was "fully informed of the settlement agreement [and] had accepted the same." Id. at 290, 291.  After plaintiff refused to sign a written agreement, defendants moved to dismiss his lawsuit on the basis that he had settled his claim.  Although the Third Circuit agreed with the trial court that the parties had reached a compromise, id. at 291, the appellate court held that "[a]n oral agreement is unenforceable in the face of Article 3071" and that the "trial judge was powerless to dismiss the plaintiff's suits without a written contract of compromise," which plaintiff refused to sign.  Id. at 292 (emphasis added).  The court never stated that plaintiff's oral settlement authority to his attorney was insufficient.

In the instant case, the court need not resolve whether the authority to accept a settlement offer must be written because, as discussed below, the evidence fails to establish that Causey consensually gave his attorneys even oral authority to settle the case for the amount offered.

10

B.    <u>Duress as a Vice of Consent</u>

The Louisiana Civil Code prescribes rules for contract formation.  "A contract is formed by the consent of the parties established through offer and acceptance . . . , [which] may be made orally . . . ."  La. Civ. Code art. 1927.  "Consent may be vitiated by error, fraud, or duress."  <u>Id.</u> art. 1948.

> Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation.  Age, health, disposition, and other personal circumstances of a party must be taken into account in determining reasonableness of the fear.

<u>Id.</u> art. 1959.

Thus, under article 1959, "duress is determined by using a subjective as well as objective standard.  The person's personal reaction to circumstances is the subjective element, while the reasonableness of the fear and the unjustness of the injury based on how reasonable persons would react to the circumstances make up the objective element."  <u>Savoie v. Terrebonne Par. Sch. Bd.</u>, No. 98-1006, 2000 WL 136008, at *6 (E.D. La. Feb. 4, 2000) (citing <u>Averette v. Indus. Concepts, Inc.</u>, 673 So.2d 642 (La. App. 1st Cir. 1996)).

> [A] proper interpretation of this Article must necessarily focus on objective and subjective characteristics.  This can be done by first determining the subjective characteristics of the individual who claims he or she was forced by violence or threats into agreeing to a contract and then deciding whether other reasonable persons with the same subjective characteristics would have felt forced into signing the contract under the same type of threat or violence.[3]

---

[3]The 1984 Civil Code revision that enacted article 1959 "substitutes the term 'duress' for 'violence or threats,' the expression used in the source Articles," but was not intended to change the

Lewis v. Lewis, 387 So. 2d 1206, 1210 (La. App. 1st Cir. 1980) (citing former La. Civ. Code art. 1851, reenacted in 1984 as current art. 1959); accord Std. Coffee Serv. Co. v. Babin, 472 So. 2d 124, 127 (La. App. 5th Cir. 1985).

"[T]he contract-invalidating duress referred to is that which proceeds from a fear of force or violence which wipes out freedom of consent; it connotes an actor performing an exterior act which gives rise to the duress, rather than the entire set of objective circumstances causing the victim to act as he does." Bd. of Comm'rs v. Turner Marine Bulk, Inc., 629 So. 2d 1278, 1283 (La. App. 4th Cir. 1993) (quotation and emphasis omitted).

Duress exists if "a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent. The result of this type of duress is that the contract that is created is voidable by the victim." La. Civ. Code art. 1959 comment (b) (citing Restatement, Second, Contracts § 175 (1981)). Inherent in this definition "is the element of a lack of legal justification, or wrong, behind the threat or action." M.P.W. v. L.P.W., 136 So. 3d 37, 50 (La. App. 1st Cir. 2013); accord Leonard v. Reeves, 82 So. 3d 1250, 1261 (La. App. 1st Cir. 2012) . "Generally, . . . 'duress' means 'a threat of harm made to compel a person to do something against his or her will or judgment' or, more specifically, 'a wrongful threat made by one person to compel a manifestation of [seeming]

---

law. La. Civ. Code art. 1959 comment (b). "In sum, 'duress' is a word of art or technical word in the English language which expresses exactly what is meant by 'violence or threats' in C.C. Arts. 1850-1852 (1870). Its adoption in this revision is not intended to incorporate notions incompatible with that meaning." Id.

assent by another person to a transaction without real volition.'" Id. (quoting Black's Law Dictionary 542 (8th ed. 2004)) (emphasis in original).

"Consent is vitiated even when duress has been exerted by a third person." La. Civ. Code art. 1961; accord Bryant v. Levy, 28 So. 191, 197 (La. 1900) (citing former La. Civ. Code art. 1852, reenacted in 1984 as La. Civ. Code art. 1961); Wilson v. Aetna Cas. & Sur. Co., 228 So. 2d 229, 232 (La. App. 3d Cir. 1969) (citing former La. Civ. Code art. 1852).

"A threat of doing a lawful act or a threat of exercising a right does not constitute duress." M.P.W., 136 So. 3d at 50 (citing La. Civ. Code art. 1962; Leonard, 82 So.3d at 1261-62). However, "a threat of doing an act that is lawful in appearance only may constitute duress." Wolf v. La. State Racing Comm'n, 545 So. 2d 976, 980 (La. 1989) (citing La. Civ. Code art. 1962).

"Some Louisiana courts have held that economic stress does not constitute legal duress as contemplated by Article 1959. However, the [Louisiana] supreme court has held that the fear of economic deprivation can constitute duress that vitiates consent." Monterrey Ctr., LLC v. Ed.ucation Partners, Inc., 5 So. 3d 225, 231 (La. App. 1st Cir. 2008) (citing Wolf, 545 So. 2d at 981); see also id. at n.6 (citing Std. Coffee Serv. Co., 472 So. 2d at 127) (stating that the Louisiana Fifth Circuit in Std. Coffee held "that the defendant felt coerced, by threat of economic vulnerability, into signing the contract. The fifth circuit stated 'Babin was faced with being deprived of his economic security, although a healthy male and able to earn a living. He was in a vulnerable position: either sign or be

fired."); <u>Averette</u>, 673 So. 2d at 642 ("This court in <u>Averette</u> . . . did not preclude the possibility that economic duress may constitute legal duress . . . .")); <u>id.</u> at 227-28, 232 (vacating grant of summary judgment to plaintiff/lessor because material fact issues were in dispute whether duress vitiated defendants/lessees' consent to lease contract, when plaintiff's principal threatened that she could "kill the sale" to a third party of defendants' property, on which they were facing a huge balloon loan payment, unless they leased her property); <u>Conrad v. Doe</u>, 545 So. 2d 677, 680, 681 (La. App. 5th Cir. 1989) (Plaintiff "alleges economic coercion" regarding a $30,000 loan that his attorney refused to disburse to him unless plaintiff allowed the attorney to continue representing him in plaintiff's underlying personal injury action, "as well as in his assertion that [the attorney] refused to withdraw from the case (thereby making it difficult or impossible for the case to proceed with new counsel.)." These "serious allegations . . . , if proven, could very well constitute duress sufficient to vitiate [plaintiff's] consent to the second [contingency fee] contract.").

Given this case law, "[i]t is sometimes necessary for the court to engage in a fact-intensive inquiry in order to determine whether a contract is void for economic duress." <u>Sumrall v. Ricoh USA, Inc.</u>, No. 15-00061, 2015 WL 4644328, at *8 (M.D. La. Aug. 4, 2015). "While the bar to successfully assert economic duress to the extent that it vitiates a party's consent is a high one, [particular] facts [may] clear the bar . . . under the circumstances," such as in <u>Sumrall</u>, when the economic viability of plaintiff's business

depended on its contract with defendant, plaintiff was not the cause of her own financial distress, and defendant's conduct created the fear of economic duress.  Id. at *9.

III.    THE EVIDENCE

    A.    Testimony of Jeffrey Green

Jeffrey Green was Causey's attorney on July 7, 2017.  He testified that he believed he had authority from plaintiff on that date to accept State Farm's settlement offer of $150,000 in new money in addition to payments State Farm had already made because Causey told him by telephone to accept the offer.  Hearing transcript, Record Doc. No. 91 at pp. 5-6 (hereafter "Tr.").  Green stated that, after plaintiff told him to accept the offer, Causey started talking about other lawyers who might have been able to obtain more money.  Green said he became "a little concerned [about] where [Causey] was going with it," so he put plaintiff on his office speaker phone and used his cell phone to record the rest of their conversation.  Green played the recording, which lasted 1 minute and 55 seconds, in open court and e-mailed a copy of it to the court's clerk during his testimony.

In the recording, Green tells plaintiff that he recommends the settlement because "we went before a federal judge yesterday who told us that there's no way we can get another penny than what [State Farm is] offering" and that the opinions of other lawyers who have not worked on the case, do not have "skin in the game" in terms of attorney time and expenses, have not seen all the evidence and have not "sat down with a federal judge

to be given a pretty frank opinion" do not matter very much. Causey responds, "I agree

with you on that." The conversation continues:

> Green: All right. So I'm gonna call [defense counsel] Ryan [Acomb], make
> sure we can get the 150 and I'm gonna take the 150, right?
> Causey: That's your call. I told you, whatever you decide to do, I'll sign off
> on whatever you do.
> Green: All right.
> Causey: I told you that.
> Green: Well as soon as I get everything done, hopefully today, I'll call you
> and let you know. Okay?
> Causey: I'll do it.
> Green: All right, T.C., take care, man.
> Causey: All right man.
> Green: Bye.

Audio recording, Defendant's Exh. H.

In his testimony, Green identified the email dated July 7, 2017 at 9:27 a.m., in which

he received a settlement offer of $150,000 from Acomb, and Green's reply the same day

at 1:25 p.m. that plaintiff "authorized me to accept $150,000, new money, full and final to

settle this case." Defendant's Exh. A. Green testified that, before he turned on his speaker

phone to record his conversation with Causey that day, plaintiff "told me to accept the

offer." Green said he turned on the recorder "because I got the impression [plaintiff] was

equivocating," but he believed that Causey had authorized him to accept the offer when he

sent the email to Acomb. Tr. at p. 9.

On cross-examination, Green testified that he spoke to Causey by telephone

sometime in the morning of July 7, 2017. He has nothing in writing from Causey

authorizing him to accept the settlement offer. Green stated that, after he accepted

defendant's offer, plaintiff sent him "a number of letters" in which he tried to negotiate his attorney's fee, but Causey "never once said, 'I don't want the 150'" until about one month later. Id. at p. 10.

On redirect examination, Green testified that he had a written contract of representation with Causey. He stated that the version shown to him by defendant's counsel in court and received into evidence is a little different than the one he recalls because it contained some handwritten notations by plaintiff, but that it is their contract. Id. at pp. 11-12, 16-17; Defendant's Exh. G. Green said the contract gives the attorneys authority to act in Causey's best interest, but not specifically to settle a case, and that it is the only writing in which plaintiff gave him authority to act. Id. at pp. 12-13.

B.    Testimony of Tyrone Causey

Plaintiff testified that his entire conversation with Green on July 7, 2017 lasted about 30 minutes, not merely the less than two minutes that was recorded, and that he believed that the recording had been edited. Causey stated that he always uses a speaker phone and that he used it when he talked to Green that day.

Causey stated that another attorney, Green's law partner, Casey Cowley,[4] called him at 10:00 that morning. He said his conversation with Green did not occur in the morning, as Green testified, but that plaintiff called Green "in the evening" that day. Id. at pp. 19-20. He clarified that "evening" meant around 2:30 or 3:00 in the afternoon. Id. at 20.

---

[4]Plaintiff initially said that Casey's last name was Collins, but he corrected the name to Cowley later in his testimony. Id. at p. 25.

Plaintiff testified that he attended a settlement conference in the chambers of the undersigned magistrate judge on July 6th, at which I explained that State Farm was making a good offer, but also told Causey that he did not have to take it.  Causey said he told me that he could not take the offer.  He testified that Green and Cowley told him after they left the settlement conference that they would resign from his case if he did not accept the $150,000 offer.  Id. at pp. 21-22.

Causey stated that his attorneys knew that the presiding district judge, Judge Feldman, had ordered that no more delays in the trial date would be allowed.  Plaintiff said "it was like they were trying to put a gun to my head to try to make me take" the offer, but he told them he would not accept it.  He "got very upset [with his attorneys] because it was like they stuck a knife in my back trying to make me do something I didn't want to do."  Causey said that Green told him to "'call me tomorrow, and . . . you better tell me that you are taking $150,000.'  I told Jeff . . . 'You'll never get that call.'"

Plaintiff continued to be "very upset" when he went home that evening and spoke with his next door neighbor, Fred Miller.  Id. at p. 22.  He said he told Miller what his lawyers had said about the settlement offer and that "'[t]hey're trying to put a gun to my head and make me take it.'"  He told Miller and his girlfriend, Amanda "Cookie" McIntyre, of his understanding that Judge Feldman was a "strict" judge who would not continue his trial again, that only three weeks remained before his trial date and that he would be unable

18

to find another attorney to handle his case.  Plaintiff was so upset that he took too much pain medication for his headache and did not sleep that night.  <u>Id.</u> at pp. 28-29.

After McIntyre left for work the morning of July 7th, Miller came to plaintiff's house about 9:30 a.m. to check on him and was still there when Cowley called about 10:00 a.m. Causey testified that Cowley explained why he should take the offer, while plaintiff explained to Cowley why he could not take it.  Cowley repeated that plaintiff's attorneys would resign if he did not accept.  <u>Id.</u> at p. 29.  When Causey protested that he had hired the lawyers because they promised to take his case to court, Cowley said he would talk to Green.  Cowley called back about 30 minutes later and told Causey that Green said that plaintiff had to take the offer or "'we're out of here.'"  <u>Id.</u> at p. 30.  Miller heard the entire conversation on plaintiff's speaker phone.  Causey again explained to Cowley the medical reasons why he could not accept.  Cowley apparently decided to talk to Green again, because Cowley called back between 15 and 60 minutes later.  <u>Id.</u>

Plaintiff testified that Cowley said he had talked to Green and plaintiff's other lawyer, Ron Austin, and both had again stated that Causey must take the offer or they would resign.  <u>Id.</u> at p. 31.  None of his attorneys ever told him they needed the court's permission to withdraw from his case.  <u>Id.</u> at pp. 31-32.  <u>See</u> E.D. La. Local Rule 83.2.11 ("The original counsel of record <u>must</u> represent the party for whom he or she appears <u>unless the court permits</u> him or her to withdraw from the case.  Counsel of record <u>may</u>

19

obtain permission [from the court to withdraw] only upon joint motion (of current counsel of record and new counsel of record) . . . .") (emphasis added).

Plaintiff did not want to accept State Farm's $150,000 offer for several reasons, which he had explained to his attorneys. First, his medical bills were $117,000, which State Farm had reimbursed in part, but he still owed almost $40,000. Second, he had suffered back and head injuries and a concussion with loss of memory, migraine headaches and light constantly hurting his eyes. He believes that his concussion will not get better, will only get worse, and puts him at greater risk for suicide and "Old Timers disease." Id. at pp. 32-33. He stated that he will need to pay someone to take care of and watch him for suicidal impulses. Id. at p. 33.

Causey testified that he had turned down an offer of $150,000 when his prior attorneys, John Daly and Jack Sileo, represented him. Id. at p. 34. He said he told Austin and Green about that offer and refusal when he hired them.

Plaintiff was familiar with Judge Feldman's January 2017 order granting his previous attorney's motion for leave to withdraw, continuing the trial date so Causey could obtain new counsel, and ordering that there would be no more delays regardless whether plaintiff had new counsel. Plaintiff's Exh. A. He showed the order to his new attorneys when he hired them. Tr. at p. 36. As a result, Causey "knew, when they told me they were going to resign, I didn't have nothing," which caused him to be so upset the night of the

20

settlement conference that he took more than his regular doses of Wellbutrin,[5] Seroquel[6] and Percocet.[7] Id. at p. 37.

Plaintiff stated that his call to Green on July 7th lasted 30 to 40 minutes and that the recording Green played at the hearing was only the end of the call. Id. at pp. 37-38. Causey was upset and angry after his last conversation with Cowley. He felt "helpless" because he knew he could not go to trial without an attorney. After Miller and McIntyre suggested he call Green, Causey called Green around 2:30 or 3:00 p.m. He said he never talked to Green in the morning. Id. at p. 38.

Causey explained to Green that he could not take the offer because his father and uncle had been in a car accident in which his uncle had died and his father "is all messed up" because he only had minimal insurance. Plaintiff said he told Green that he bought one-half million dollars in insurance so the same thing would not happen to him, because he has no children or siblings to take care of him. He stated that he told Green he would not take $150,000 and that Green was sympathetic and agreeing with him. Id. at pp. 39-40.

---

[5]Wellbutrin (generic name: bupropion hydrochloride) is used to treat depression. PDR.net (2017), http://www.pdr.net/pdr-consumer-monograph/wellbutrin?druglabelid=237&ConsumerId=5227 (last visited Nov. 21, 2017).

[6]Seroquel (generic name: quetiapine fumarate) is used to treat schizophrenia and can be used to treat bipolar disorder alone or in combination with other drugs. Id. http://www.pdr.net/pdr-consumer-monograph/seroquel?druglabelid=2185&ConsumerId=1402 (last visited Nov. 21, 2017).

[7]Percocet (generic name: acetaminophen/oxycodone) contains acetaminophen and oxycodone and is used to relieve moderate to moderately severe pain. Id. http://www.pdr.net/pdr-consumer-monograph/percocet?druglabelid=2483&ConsumerId=1326 (last visited Nov. 21, 2017).

Plaintiff admitted that he told Green, "That's your call.  I'll sign off on whatever you do," at the end of their phone call.  He explained why he said that, as follows.

> A.    Because he was telling me then, "Hey, I'm going to look after you.  I got you.  I understand.  We're not going to take – I mean, if we can't get [$]300,000 or more, you know what I mean, we are not going to take it.  We're going to go to court."  That's what he was telling me.
> Q.    So when you said, "That's your call.  I'll sign off whatever you do," that wasn't agreeing to $150,000?
> A.    Oh, no.  Oh, no.  Oh, no, I wasn't agreeing to that.  No.  Unh-unh.  Not at all.  I was not agreeing to that.

Id. at p. 40.

On cross-examination, plaintiff testified that the recording was "audited" and only contains "bits and pieces" of the conversation taken out of context.  Id. at pp. 42-43.  He stated that, when Green called him back later to say that Green had accepted the offer, Causey said "okay" because he thought there was nothing he could do.  However, he stated that, when Green called again and said he would fax the release, plaintiff told Green he would not sign anything.  Id. at p. 43.  He testified that he fired his attorneys the next day because they "are trying to rip me off.  They tried to put a gun to my head and tried to make me take something that I did not want to take."  Id. at pp. 43-44.

Causey stated that he told Green, "'I'm not signing anything.'  I said, 'You took that.'  I said, 'I'm not signing that.  I didn't take that.'"  Id. at pp. 44-45.  He testified that Green called him back about 5:30 or 6:00 that evening regarding the release.  Plaintiff stated that Green called him another time to say that he had recorded their conversation and

22

played a few seconds of the recording for him, but Green would not play the entire recording. Id. at p. 49.

Causey testified that Green agreed with him during their long conversation on July 7th about the reasons why plaintiff would not accept the offer, that Green stated that he would look out for plaintiff and that Causey responded, "'Okay, you're my lawyer. I'm with you a hundred percent.'" Id. at p. 50.

C.    Testimony of John Michael Daly, Jr.

John Michael Daly, Jr. was Causey's attorney who filed the original petition in state court in this matter. He testified that he withdrew from representing plaintiff after Causey terminated him during a private mediation. Id. at p. 52.

Daly identified a letter that he wrote on October 3, 2017, after plaintiff came to his office and requested a letter "setting forth some of the facts that may have occurred in this matter." Id. at p. 52. Daly wrote the letter at plaintiff's instruction, stating that he believed that plaintiff's then-current counsel (when Daly was not representing Causey) had said during a telephone conversation that State Farm had made a conditional settlement offer of $150,000, and that Causey had declined to entertain an offer. Id. at pp. 52-53; Plaintiff's Exh. B. Daly vaguely remembered listening to the conversation between Causey and his attorney at that time, Jack Sileo, as a courtesy to plaintiff, but could not recall the date of the conversation. He did not hear State Farm make any offer. Tr. at pp. 54-55. He had no authority to settle the case while he represented Causey. Id. at p. 58.

D.   <u>Testimony of Fredrick Miller, III</u>

Fredrick Miller, III, is Causey's neighbor and has known plaintiff for more than 30 years. He was at plaintiff's house on July 7, 2017 and heard Causey's phone conversations that day because Causey always uses a speaker phone. <u>Id.</u> at p. 59.

Miller stated that the first phone call between 9:30 and 10:00 that morning was from someone named "Casey" and concerned an offer for $150,000. Miller was at plaintiff's house to check on him because Causey was depressed. <u>Id.</u> at pp. 61-62. Miller heard Casey tell plaintiff that, if he did not take the $150,000, Casey would resign from the case, and heard plaintiff respond that he would not take $150,000. The conversation did not last very long. <u>Id.</u> at p. 62.

Miller heard a second conversation later the same day that was "basically the same," when Casey told plaintiff that he would call "Jeffrey" about plaintiff's refusal to accept $150,000. Miller said Casey called a third time around noon or early afternoon. <u>Id.</u> at pp. 62-63. Miller heard Casey say that "he had talked to Jeffrey and that was it. That was – if he [Causey] wouldn't accept the $150,000, he [the attorney] would resign from his case and that was it. You know, it was over." <u>Id.</u> at p. 64. Plaintiff again refused the offer.

Miller stated that plaintiff called Jeffrey around 3:30 or 4:00 the same day. Miller testified that he returned to his own house after Casey's third phone call, but that he and Amanda were with plaintiff later that day. <u>Id.</u> at pp. 64-65. Because Causey was "distraught," Miller suggested that he call Green, which plaintiff did. Miller did not hear

any other calls between plaintiff and any attorney that day between the third phone call from Casey around noon and Causey's call to Green around 3:00 p.m.  Id. at p. 66.

During the 3:00 p.m. phone call, Miller heard Causey explain about his father's and uncle's automobile accident and tell Green why he could not take the money.  Miller only heard the beginning of the phone call because he left while Green and Causey were still talking and never returned to plaintiff's house that day.  Id. at 67.

E.    Testimony of Amanda McIntyre

Amanda McIntyre lives with Causey, who is her boyfriend.  Id. at p. 70.  She has known him for one year and knew him in July 2017 when he came home from the conference on July 6th.  Id. at p. 71.

Causey always has used a speaker phone as long as McIntyre has known him.  She got off work at 12:30 p.m. and was home on Friday, July 7, 2017 about 1:15 to 1:30 p.m., when she heard "Casey" call plaintiff on the speaker phone.  She heard Casey tell plaintiff that the attorneys would resign if plaintiff did not take the $150,000, and heard Causey tell Casey he would not take it.  Id. at 72-73.

McIntyre testified that Casey said he had talked with Jeffrey and that plaintiff either "take[s] the 150 or they are going to resign off his case and that's the last chance."  She heard no other phone calls between plaintiff and Casey that day.  Id. at 73.  She stated that plaintiff was upset and depressed because he "felt that they was messing over him," so she and Miller calmed him down by suggesting that he call Jeffrey Green.

McIntyre initially said that plaintiff called Green between 5:30 and 6:00 p.m. that day, id. at 74, but she clarified that Causey called Green about 3:00 p.m. and that the 5:30 call was from Green to Causey. She did not leave the house between 1:15 and 3:00 p.m. She testified that she heard the beginning of plaintiff's first phone conversation with Green, but she left the room after about 20 minutes because Causey was calm while talking to Green. She did not hear any more of the conversation, which was ongoing when she left. Id. at 75-76. She heard Causey explain to Green that he would not take the $150,000 because of the accident in which plaintiff's uncle died and his father was left without money to care for himself. She did not hear Green's response or the rest of the conversation because she left the room and did not return until close to 5:00 p.m. Id. at 76.

McIntyre stated that Green called plaintiff about 5:30 or 6:00 that day and told Causey that Green had settled with State Farm. She testified that Green asked if that was okay and Causey responded, "That's okay." She stated that Green said he would fax a form for plaintiff to sign accepting the $150,000, at which point plaintiff said, "'I'm not signing . . . that agreement form because you agreed to that, not me." McIntyre stated that Causey fired Green the next day. Id. at 77.

F.     Exhibits

Defendant's Exhibit A is an email chain beginning with defense counsel's message to plaintiff's counsel Green at 9:27 a.m. on July 7, 2017, confirming defendant's settlement offer of $150,000. Green responded to defense counsel, with copies to plaintiff's attorneys

Austin and Cowley, at 1:25:30 p.m. the same day that "Tyrone Causey has authorized me to accept $150,000, new money, full and final to settle this case. . . .  Please let me know if you would prefer to notify the court, or if I should."  The docket record in the instant matter shows that State Farm's counsel filed a notice of settlement agreement at 2:17 p.m. on July 7, 2017.

Defendant's Exhibit B is a July 14, 2017 transmittal letter from defense counsel to Green, enclosing a draft for $150,000 in settlement.

Defendant's Exhibit C is an email from defense counsel to Green dated July 17, 2017, with an attached receipt and release, asking Green to have the release executed and to return it to defense counsel.  Defendant's Exhibits D, E and F are followup emails from defense counsel and/or a member of his staff to Green dated July 24, August 1 and August 23, 2017, asking Green to send the executed release to defense counsel.

Defendant's Exhibit G is a contingent fee contract between Causey and Ron Austin & Associates, L.L.C.

Plaintiff's Exhibit A is Judge Feldman's order dated January 19, 2017, Record Doc. No. 31, which allows plaintiff's prior attorneys to withdraw, continues the trial date and states:  "Whether or not represented by counsel, <u>no further requests for delay of this case will be entertained</u>."  <u>Id.</u> at p. 2 (emphasis added).

27

IV.    FINDINGS AND CONCLUSIONS

I do not find that any of the witnesses is not credible. Each witness's bearing, demeanor, sincerity and straightforward manner of testifying convince me that each one testified truthfully, based on his or her knowledge and perception of the events.

Assuming without deciding that Louisiana law allows a client to give his attorney oral authorization to settle, I credit Green's testimony that he believed he had plaintiff's authority to settle after their first telephone conversation on July 7, 2017. Although there is a discrepancy regarding the timing of that phone call between the testimony of Causey, Miller and McIntyre on the one hand (the call occurred some time between 2:30 and 4:00 in the afternoon) and Green's testimony (it occurred in the morning) on the other hand, the timing is not particularly important and does not undermine the credibility of Causey, Miller and McIntyre because Green in no way contradicted their testimony about the content of the conversation. When defendant's attorney electronically notified the court on July 7, 2017 that the case had settled, State Farm justifiably relied on Green's email stating that Causey had accepted defendant's offer.

Nonetheless, Green's testimony about what he believed Causey authorized him to do is contradicted by Causey's own credible testimony, the credible testimony of Miller and McIntyre who heard Causey tell both Cowley and Green on July 7th that he did not want to settle for $150,000, and the entire sequence of relevant events. The recording that

28

Green made of the last two minutes of his 30-minute phone conversation with Causey does not persuade me that plaintiff intended to authorize Green to accept State Farm's offer.

I find that Causey repeatedly told his attorneys that he did not want to take the offer during the settlement conference on July 6th, at the courthouse immediately after the conference, during three phone calls with Cowley on July 7th, and throughout his first phone call with Green.  Green admitted that, after he thought that Causey had authorized him to settle for $150,000, plaintiff started talking about other lawyers who might have been able to obtain more money and Green then decided to record the rest of the conversation because he became "a little concerned [about] where [Causey] was going with it" and "got the impression [plaintiff] was equivocating."  Thus, immediately after Causey supposedly authorized Green to accept the offer, Causey was expressing and Green was hearing that plaintiff did not want to take $150,000.  I find that, in the last two minutes of that lengthy phone call, after hours of persistent pressure by plaintiff's attorneys to settle in the face of Judge Feldman's order that no further continuances would be granted and Causey's reasonable assumption that he would be unable to retain a new attorney three weeks before a scheduled jury trial, all of which Causey sincerely perceived as coercion, plaintiff basically gave up trying to convince Green of his position and told Green that "whatever you decide to do, I'll sign off on whatever you do."

In the context of the entire 24-hour sequence of events, I find that Green was mistaken in his belief that Causey had authorized him to accept the settlement offer.  The

clear inference from Green's own testimony is that he was still unsure whether Causey wanted to accept the offer when Green decided to record the conversation. I find that Causey did <u>not</u> accept the offer in those last two minutes of the conversation. Instead, he was essentially saying that he was finished trying to make his point when his attorneys were not accepting his instructions. His failure to object when Green spoke to him later that day about the supposed settlement was consistent with Causey's feeling of frustration that there was nothing else he could do. His refusal to sign the settlement agreement was consistent with his repeated statements that he would not accept the settlement offer. Therefore, I find that Causey did <u>not</u> authorize Green to accept defendant's offer on his behalf. In the absence of plaintiff's consent, no settlement agreement was reached.

Even if Causey accepted the offer, I find that his consent was vitiated by duress. While it is true that courts rarely find that economic duress vitiates consent, it is not accurate that such duress can never vitiate consent. Consent may be vitiated when the particular facts warrant a finding of subjective and objective duress. The instant matter is distinguishable from some of the reported cases in which no duress was found because in this matter, unlike in those cases, Causey's own attorneys threatened to withdraw in order to pressure him into a settlement shortly before trial, despite his repeatedly stated desire to reject the offer and his fear that he would have to proceed to trial without a lawyer, in light of Judge Feldman's order. Although the attorneys' best legal advice may have been to

accept the offer, "the decision to accept a settlement belongs to the client alone." Culpepper & Carroll, 929 So. 2d at 1227 (citing La. R. of Prof. Conduct 1.2(a)).

The actions of plaintiff's attorneys were an exterior act that gave rise to the duress. Bd. of Comm'rs, 629 So. 2d at 1283. An attorney is obligated to represent his client's best interests, but also to follow the client's instructions regarding settlement. An attorney may withdraw from representation if "(4) the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement;" or "(6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or (7) other good cause for withdrawal exists." La. R. of Prof. Conduct 1.16(b). However, counsel of record must obtain the court's permission to withdraw. La. R. of Prof. Conduct 1.16(c); Local Rule 83.2.11. "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." La. R. of Prof. Conduct 1.16(c).

Although a "threat of doing a lawful act or a threat of exercising a right does not constitute duress," M.P.W., 136 So. 3d at 50 (citations omitted), "a threat of doing an act that is lawful in appearance only may constitute duress." Wolf, 545 So. 2d at 980 (citation omitted). Causey's attorneys threatened to withdraw if he did not accept the settlement, but they did not advise Causey that they must obtain the court's permission to withdraw or that the court might deny such permission in this case in which two prior sets of attorneys

had withdrawn, Judge Feldman had ordered that no further continuances would be granted and only two weeks remained before the final pretrial conference and four weeks before the trial.   In these circumstances, I find that the attorneys' threatened withdrawal constituted undue duress.

The court next determines whether Causey's personal reaction to the circumstances satisfies the subjective element of duress.   Savoie, 2000 WL 136008, at *6.  Plaintiff's subjective characteristics at the time were that he had suffered injuries in two automobile accidents (one of which was the subject of the instant lawsuit), including back injuries and a concussion with loss of memory, migraine headaches and light constantly hurting his eyes.  He believes that his concussion will not get better, will only get worse, and puts him at greater risk for suicide and "Old Timers disease."  His father had suffered injuries in an automobile accident that was fatal for his uncle, after which his father had insufficient money to care for himself.  Plaintiff still owed almost $40,000 in medical bills and believed that $150,000 was inadequate for the care he expected to need.  He was taking pain medication and anti-depressants.  He perceived that his attorneys had promised to take his case to trial.  He was so upset by his own attorneys' pressure to accept the offer and threat of resignation in the face of an impending jury trial that he took excessive amounts of medication on July 6, 2017 and had not slept that night.  Causey was upset, angry, felt "helpless," thought that his attorneys "tried to put a gun to my head" to force him to accept

the offer, and believed that his case would be over if they resigned and he had to represent himself at trial. His subjective characteristics satisfy this element of duress.

The court must then determine whether other reasonable persons with the same subjective characteristics would have felt forced into signing the contract under the same type of threat. Lewis, 387 So. 2d at 1210; Std. Coffee Serv., 472 So. 2d at 127. I find that this objective element is also satisfied. Causey's own attorneys made it clear that they would withdraw from his representation shortly before trial if he did not accept the settlement offer. Causey understandably feared going to trial pro se before a "strict" judge in just four weeks, which for him was a wholly untenable position. An objective person would have believed that he had no option other than to surrender in frustration, despite his clear desire to reject the settlement offer.

This case is unlike In re Peter, 735 So. 2d 665 (La. App. 4th Cir. 1998), which is cited by State Farm, in which the court found no "evidence regarding duress-causing threats made by" plaintiff's own attorney, who presented defendant's settlement offer to plaintiff and advised her "that she will most likely not receive anything more," which "does not rise to the level of duress-inducing threats sufficient to vitiate consent." Id. at 668 (emphasis added). There is uncontradicted evidence in the instant case of duress-causing statements by Causey's attorneys, which makes this case more like Conrad, in which plaintiff alleged that his own attorney exercised "economic coercion" by refusing to disburse a $30,000 loan to him unless plaintiff allowed the attorney to continue

representing him in plaintiff's underlying personal injury action, "as well as in his assertion that [the attorney] refused to withdraw from the case (thereby making it difficult or impossible for the case to proceed with new counsel.)." Conrad, 545 So. 2d at 680. These "serious allegations . . . , if proven, could very well constitute duress sufficient to vitiate" plaintiff's consent to a new contingency fee contract. Id. at 681; see also Monterrey Ctr., 5 So. 3d at 227-28, 232 (vacating grant of summary judgment to plaintiff/lessor because material fact issues were in dispute whether duress existed to vitiate defendants/lessees' consent to lease, when plaintiff's principal threatened that she could "kill the sale" to a third party of defendants' property, on which they were facing a huge balloon loan payment, unless they signed the lease for her property).

The prospect of financial hardship in the instant case is not as extreme as it was in Wolf, where the plaintiff jockeys challenged a restriction imposed by the defendant racetrack that "would have barred the jockeys from practice of their livelihood," Wolf, 545 So. 2d at 980; or in Standard Coffee Service, where plaintiff was threatened with termination of his employment if he did not sign the employer's new contract without being allowed to consult an attorney, Std. Coffee Serv., 427 So. 2d at 127; or Bryant, where defendants were faced with financial ruin if they refused to accept plaintiffs' contract for cotton storage when no alternative was available in the marketplace. Bryant, 28 So. at 197. Nonetheless, in these particular subjective and objective circumstances, Causey "was in a vulnerable position," Std. Coffee Serv., 427 So. 2d at 127, and was induced to manifest his

assent in a situation where he had "no reasonable alternative." Wolf, 545 So. 2d at 980. This constitutes duress that vitiates consent.

Accordingly, State Farm has not borne its burden of proof to show that the requirements for a valid compromise are present.

CONCLUSION

By its nature, duress involves a finding concerning the always difficult determination of an individual's state of mind. In my view, the two-minute snippet of recorded conversation upon which this motion principally relies is not alone an accurate representation of plaintiff's relevant state of mind. Instead, the coercion and duress vitiating consent under which plaintiff made his seeming statements of acceptance of the settlement offer can properly be understood only in the context of the entire 24 hours in which these events occurred, during which plaintiff made it overwhelmingly clear–as he had at the settlement conference one day earlier–that he did not want to settle for $150,000. For all of the foregoing reasons, IT IS RECOMMENDED that defendant's Motion to Enforce Settlement Agreement, Record Doc. No. 69, be DENIED and that this matter be re-opened and set for trial.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[8]

New Orleans, Louisiana, this _____12th_____ day of December, 2017.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2] <u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

36